**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William J. DAWSON, Defendant-Appellant.**

**No. 327, Docket 31191.**

United States Court of Appeals Second Circuit.

Argued April 29, 1968.

Decided Aug. 12, 1968.

Certiorari Denied Jan. 13, 1969.

See 89 S.Ct. 632.

---

John M. Brant, Joseph M. Howard, Attys., Dept. of Justice, Mitchell Rogovin, Asst. Atty. Gen., Justin J. Mahoney, U. S. Atty., George B. Burke, Asst. U. S. Atty., for appellee.

Benjamin Ungerman, Ungerman & Harris, Albany, N. Y., for appellant.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

WATERMAN, Circuit Judge:

On April 30, 1965, William J. Dawson, then chairman of the Democratic Committee of the city of Cohoes, New York, was charged in a three-count indictment with having violated Section 7201 of the Internal Revenue Code of 1954, 26 U.S. C. § 7201,[1] in that he had wilfully attempted to evade and defeat the income tax owed by him for the years 1959, 1960, and 1961, by filing false and fraudulent joint income tax returns for him and his wife. In May 1966, after a suppression hearing had resulted in no evidence being suppressed, trial commenced in the United States District Court for the Northern District of New York, before Port, J., and a jury; appellant and over one hundred other witnesses testified, and a trial record of more than 2300 pages of transcript was built. The jury found Dawson guilty on counts 1 and 3 (1959 and 1961) and not guilty on count 2 (1960). He was sentenced to two years imprisonment on count 1—on

---

1. 26 U.S.C. § 7201 reads:
 § 7201. Attempt to evade or defeat tax
 Any person who willfully · attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

count 3 an imprisonment sentence was suspended and three years probation was imposed upon condition that appellant pay any tax arrears for 1959 and 1961. Upon this appeal, appellant makes no less than thirteen distinct assignments of error which range from allegations that the trial court made erroneous evidentiary rulings to a claim that the sentence imposed on count 1 is so excessive that it is cruel and unusual punishment violative of the Eighth Amendment. We hold that no error was committed which was prejudicial to appellant, we affirm the judgment of conviction, and find that the sentence was not unconstitutionally imposed.

### COUNT 1

Under count 1, the Government sought to prove that there were two specific items of income which appellant did not report on his 1959 return. First, the Government attempted to show that appellant had received $1,750 in cash from a business partnership operating under the name Mazra Homes with the result that, a few days after the cash had changed hands, the City of Cohoes began to install water and sewerage facilities for the partnership's real estate development. Both of the partners testified that they gave the money to appellant because they had been told that appellant "ran things" in Cohoes. One partner, Michalik, testified that he went to see appellant, whom he did not know personally, and placed an envelope containing the $1,750 on appellant's desk. The other partner, Rosonoff, testified that he had previously cashed a business check for $1,750 and had given the cash to Michalik to be passed on to appellant. The Government corroborated this testimony by placing in evidence, over appellant's objection, the canceled check for $1,750 made out to "cash" and the portion of the Mazra Homes books and records which disclosed a cash disbursement of $1,750 on the day in question, noted in the records as "Cohoes for water."

Second, the Government put in evidence that appellant had made a profit of $1,300 on a sale of land in 1959 and had not reported this on his 1959 return. Joseph Simonek testified that he paid appellant $1,500 in cash for a piece of land and later received back $150 because of a defect in the title. Appellant had bought the land six years earlier from the City of Cohoes for $50. One half of this $1,300 long-term capital gain, $650, was taxable. Appellant conceded that he had not included this item in his 1959 return but claimed that property taxes and other expenses he incurred while he owned the property wiped out any profit he may have made on the sale. However, property taxes would have no effect on the amount of capital gain reportable on the sale of appellant's property, and appellant proved no specific items of expense which would have had the effect of increasing the cost basis of the property while it was in his hands.

 Appellant's first assignment of error relating to count 1 is that the canceled check and the portion of the books and records of Mazra Homes dealing with the $1,750 transaction were improperly admitted into evidence. He claims the books and records were inadmissible because Michalik, the witness whose testimony supposedly laid the foundation for the receipt of these items, was not the person who kept the books and records and that his acquaintance with those items was limited to knowledge that the books had been kept by an accountant in New York City who was not a witness. However, Michalik testified that he knew the books and records were kept in the regular course of business of Mazra Homes and that it was in the regular course of the partnership business to keep such records. This testimony was sufficient to make the relevant portions of the books and records admissible under the Federal Business Records Act, 28 U.S.C. §

1732(a),[2] for the person who actually keeps the books and records and makes the entries need not testify if a person does testify who is in a position to attest to the authenticity of the records. See, e. g., United States v. New York Foreign Trade Zone Operators, Inc., 304 F.2d 792, 796 (2 Cir. 1962); Bridger v. Union Railway Co., 355 F.2d 382, 391–392 (6 Cir. 1966); Wheeler v. United States, 93 U.S.App.D.C. 159, 211 F.2d 19, 22–23 (1953), cert. denied, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954). The fact that the records offered were essentially self-serving is no bar to their admissibility under 28 U.S.C. § 1732. Compare Lind v. Schenley Industries, Inc., 278 F.2d 79, 88 (3 Cir. in banc), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960). Moreover, canceled checks are clearly admissible to prove that money was drawn from an account. In any event, no prejudice to appellant can have resulted from the admission of the check and records, for that evidence was purely cumulative to the oral testimony of the parties. Compare United States v. Schabert, 362 F.2d 369, 371–372 (2 Cir.), cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966).

Appellant also contends that, on the basis of 26 U.S.C. § 7605(b)[3] which statute provides that a second examination of a taxpayer's books and records must be preceded either by the taxpayer's consent to the examination or by a written notification from the Secretary or his delegate, the lower court should have suppressed all government evidence regarding the year 1959 obtained by Internal Revenue Agents' having audited appellant's 1959 returns. There is no merit to this contention for even if one assumes that appellant's records had once been inspected prior to the investigation which resulted in appellant's prosecution, an assumption not conceded by the Government, and even assuming further that the results of a second, unlawful inspection would be excludable,[4] we would hold that the lower court did not err in refusing to suppress. Here there was sufficient credi-

2. 28 U.S.C. § 1732(a) reads:

 § 1732. Record made in regular course of business; photographic copies

 (a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

 All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

 The term "business," as used in this section, includes business, profession, occupation, and calling of every kind.

3. 26 U.S.C. § 7605(b) reads:

 § 7605. Time and place of examination

 \* \* \* \* \*

 (b) Restrictions on examination of taxpayer.—No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.

4. In light of the disposition. we make of appellant's contention we need not decide whether violation of 26 U.S.C. § 7605(b) should lead to the exclusion of such evidence. This point has apparently not been decided in this court, and other courts are in conflict on it. Compare Field Enterprises, Inc. v. United States, 172 Ct.Cl. 77, 348 F.2d 485 (1965); Philip Mangone Co. v. United States, 54 F.2d 168 (Ct.Cl.1931), with Reineman v. United States, 301 F.2d 267 (7 Cir. 1962); Hinchcliff v. Clarke, 230 F.Supp. 91, 109 (N.D.Ohio 1963); Application of Leonardo, 208 F.Supp. 124 (N.D.Cal. 1962).

ble evidence introduced at the suppression hearing to show that, prior to appellant's very first conference with government agents regarding the charges involved in the case, a Section 7605(b) letter was sent to him. What appellant appears to be complaining about is the extensive government investigation into his affairs through interviews with third parties and the checking of public records, bank accounts, and the detail disclosed by the 1959 tax return itself. Such an investigation is not within the ambit of Section 7605(b); the section applies only to a successive inspection of the taxpayer's private books of account. See Geurkink v. United States, 354 F.2d 629, 631 (7 Cir. 1965); De Masters v. Arend, 313 F.2d 79, 86 (9 Cir.), cert. dismissed, 375 U.S. 936, 84 S.Ct. 341, 11 L.Ed.2d 269 (1963); compare Application of Magnus, 299 F.2d 335 (2 Cir. 1962). Indeed, a preliminary investigation of the type made here is expressly contemplated in the statute: " * * * or unless the Secretary or his delegate, *after investigation*, notifies the taxpayer * * *." 26 U.S.C. § 7605(b) (emphasis supplied); see De Masters v. Arend, supra 313 F.2d at 86. Moreover, the evidence in the present case indicates that appellant never permitted the agents to examine his books and records and this fact provides an alternate basis for supporting the trial court's determination; it could have found that there was nothing to suppress because there was no second examination in violation of 26 U.S.C. § 7605(b).

■ Appellant also contends that witness Michalik's testimony that $1,750 graft was paid to appellant is incredible as a matter of law. There is no merit to this claim, for although there were minor inconsistencies in Michalik's testimony and it was brought out that Michalik neither knew appellant personally nor knew appellant's occupation, it was also brought out that Michalik knew appellant "ran things" in Cohoes. Too, Rosonoff corroborated Michalik. Obviously it was for the jury to decide whether the $1,750 was paid. Appellant

apparently overlooks the fact that even if we were to accept all of appellant's contentions regarding the evidence unfavorable to him on count 1, we would still be required to uphold the conviction on that count, for he advances no assignment of error in the reception of the Government's proof that he failed to report his capital gain from the sale of land to Simonek.

■ This latter observation leads into appellant's final contention regarding count 1, that the sentence imposed thereunder (two years imprisonment), considering the relatively minor tax evasions proved by the Government was harsh to the point of constituting cruel and unusual punishment in violation of U.S.Const. amend. VIII. The count 1 conviction was under 26 U.S.C. § 7201, which provides for a maximum sentence of five years imprisonment or a $10,000 fine or both. It is well settled that a sentence imposed within the limits of a statute cannot amount to cruel and unusual punishment, and that when a statute provides for punishment thought to be violative of the amendment the constitutionality of the statute itself must be attacked. See, e. g., United States v. Rosenberg, 195 F.2d 583, 607–609 (2 Cir.), cert. denied, 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687 rehearing denied with mem. opinion, 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 652 (1952); Martin v. United States, 317 F.2d 753, 755 (9 Cir. 1963); Pependrea v. United States, 275 F.2d 325, 329–330 (9 Cir. 1960). No attack is made on the validity of the statute here. Moreover, it is clear that an appellate court has no power to modify or reduce the sentence, United States v. Rosenberg, supra, 344 U.S. at 890, 73 S.Ct. 134, and 195 F.2d at 604–607; Pependrea v. United States, supra at 329–330. Appellant must seek his relief by filing a motion in the district court for reduction of sentence within the time prescribed by Fed.R.Crim.P. 35.

### COUNTS 2 AND 3

While the Government used evidence of specific unreported items of income

to prove appellant evaded his 1959 tax liability, it sought to prove evasion of liability for 1960 and 1961 by the net worth plus non-deductible expenditures method.[5] The Government alleged unreported taxable income of $29,588.87 for 1960 based upon a comparison of appellant's reported taxable income for that year with appellant's non-deductible expenditures for 1960 plus the difference between his net worth at the end of 1960 and his net worth at the beginning of 1960. It alleged unreported taxable income of $69,369.77 for 1961 based upon a similar comparison for that year. The amounts of allegedly unreported taxable income for the years 1960 and 1961 corresponded roughly with amounts the Government claimed were invested in those years by appellant for his personal benefit in a closely held publishing corporation, Cohoes Publishing Corporation, in a real estate holding corporation, Cohoes Holding Corporation, and in a Lincoln Continental automobile.[6] As "a 'likely source, from which the jury could reasonably find that the net worth increases sprang,'" United States v. Costello, 221 F.2d 668, 671 (2 Cir. 1955), aff'd, 350 U.S. 359, 76 S.Ct. 406, 100 L. Ed. 397 (1956) the Government suggested that appellant had been diverting (embezzling) funds from the Democratic City Committee of which he was chairman. The controversy at trial centered around two intermingling points: (1) whether funds obtained from party coffers had been used for appellant's personal benefit or for the benefit of the political party, appellant using his own name in order to cover up the involvement of the political party, and (2) whether appellant had a personal pre-existing source of funds not received as taxable income in 1960 or 1961, being a large amount of inherited money cached in his home, that was available for these investments.

The jury found appellant not guilty on count 2 and guilty on count 3. That the verdict returned for 1960 was "not guilty" and the verdict returned for 1961 was "guilty" can be explained, arguably, by the fact that when the trial judge charged the jury he pointed out the applicability to their deliberations of the holding in James v. United States, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961). In *James*, decided on May 15, 1961, the Supreme Court overruled Commissioner of Internal Revenue v. Wilcox, 327 U.S. 404, 66 S.Ct. 546, 90 L. Ed. 752, 166 A.L.R. 884 (1946), where it had been held that embezzled funds are not includable by an embezzler in his reportable gross income, and ruled that embezzled funds were so includable in the return for the year of the embezzlement. James, an embezzler, had not included such funds as part of his gross income. He was prosecuted for income tax evasion and was convicted. On appeal, the United States Supreme Court, though overruling *Wilcox*, the case James relied upon, nevertheless reversed James's conviction on the ground that when he omitted to report the embezzled funds in his return he was entitled to rely on *Wilcox* and so could not be found wilfully to have filed a false return. 366 U.S. at 221–222, 81 S.Ct. 1052. Therefore, here, Judge Port charged the

---

5. The net worth method is described succinctly in Holland v. United States, 348 U.S. 121, 125, 75 S.Ct. 127, 99 L.Ed. 150 (1954), and in United States v. Costello, 221 F.2d 668, 670–671 (2 Cir. 1955) (L. Hand, J.), aff'd, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

6. The breakdown with respect to these three investments in the years in question were as follows:

| | 1960 | 1961 |
|---|---|---|
| Lincoln automobile | $ 5,500.00 | |
| Cohoes Pub. Corp. | 13,900.00 | $70,975.00 |
| Cohoes Holding Corp. | 11,000.00 | 2,000.00 |
| Total | $30,400.00 | $72,975.00 |

jury that, if they found that the only unreported income of appellant in 1960 resulted from his diversion of political contributions during that year, as a matter of law the element of wilfulness which is a necessary element of a violation of 26 U.S.C. § 7201 was not established, and appellant must be acquitted on count 2.[7] No such charge was given for count 3.

▮ Appellant urges that the court should have charged that *James* not only precluded a finding of wilfulness with respect to any failure to report funds diverted in 1960 but the *James* ruling was also applicable to the failure to report diverted funds in the 1961 return. He maintains that whether diverted funds are reportable income must be determined at the time of the diversion; therefore, he urges, he was entitled to rely upon the then-in-force *Wilcox* rule as to any funds diverted before May 15, 1961, the date of the *James* decision, and that, at least with respect to that much of the funds diverted in 1961, he was entitled to a charge that wilfulness could not be found as a matter of law. However, the crucial date, the date of the commission of the crime, is not when the embezzlement takes place, but when the tax return is filed, for the crime of income tax evasion occurs when the return is filed. See Nordstrom v. United States, 360 F.2d 734 (8 Cir.), cert. denied, 385 U.S. 826, 87 S.Ct. 59, 17 L.Ed.2d 63 (1966) (embezzlement May 12, 1961, return filed March, 1962). Appellant filed his return for 1961 well after the *James* decision was handed down and well after he could fairly claim that the rule in that case was a surprise. The trial court's jury instructions relative to count 3 were correct.

▮ Upon his direct examination appellant testified that he kept diaries of those who contributed funds to the party, recording their names in English and the amounts of their contributions in Japanese. Appellant attempted to have his diaries for 1959 to 1961 received in evidence as business records, but the trial court refused to admit them. However, appellant used these diaries to refresh his memory and he orally testified as to their contents. Appellant contends that the exclusion of these records was reversible trial error. Assuming, *arguendo*, that it was indeed error not to admit these records under the Federal Business Records Act, 28 U.S.C. § 1732, we believe that error was not prejudicial to appellant, for the detail in the diaries was not the core of the controversy. The Government contested neither the fact that appellant received political contributions nor the validity or accuracy of the amounts the appellant testified the Japanese symbols disclosed were contributed; the controversy was over whether any of the political contributions so received by appellant had been converted by him to his own use. Appellant testified as to the sums he received that he had recorded in Japanese. Because appellant was permitted to use the records to refresh his recollection, the jury was certainly aware that he kept records of contributions, and we perceive no further benefit that appellant could have obtained if the jury had been permitted to inspect the records from which appellant testified, especially as it does not appear that any juror could read Japanese. If error there

---

7. The full text of this portion of the charge is as follows:

With reference to Count Two, 1960, if you find that the only unreported income, if any, resulted from the personal use of committee funds by the defendant during the year 1960, as a matter of law one of the essential elements of the crime cannot be present, that is, the essential element of wilfulness as to the year 1960 has not been established, and you must find a verdict of not guilty as to Count Two. That is, if you find that the only unreported income, if you find there was any, is derived from diversion and embezzlement of political contributions, then you cannot find wilfulness.

were, it was surely not prejudicial error. Compare United States v. De Sisto, 289 F.2d 833, 834 (2 Cir. 1961).

█ At the conclusion of its case the Government was permitted to introduce into evidence summaries of the taxable income it claimed appellant received in each of the years in question: the summary for 1959 was computed by the specific item method and those for 1960 and 1961 by the net worth plus non-deductible expenditures method. However, when appellant attempted during his direct examination to introduce his own summary of the income he claimed to have received during each of those years, a summary similar in format to those of the Government, the offer of his summary was rejected. The trial judge indicated in the colloquy prior to his exclusionary ruling that he had doubts about the admissibility of a summary absent expert testimony but he only sustained the Government's objection to the summary on the ground that the order of appellant's proof was improper and that he must first give his testimony relative to the facts upon which the summary was based.[8] Appellant thereafter testified at length, but the summary was never offered again. Without determining whether such a summary is admissible with or without expert testimony, we reject appellant's assignment of error because he failed to follow the court's suggestion and did not offer the summary after he had testified to the underlying facts upon which the summary was based.

█ Appellant also urges that the trial court erred in granting government motions to quash three subpoenas he served during trial. These subpoenas would have required that: (1) the Government produce copies of all rules, reg-ulations, methods and manuals for the guidance and advice of Internal Revenue personnel in the conduct of the investigation of a taxpayer which precedes the decision that the "net worth" method of determining the taxpayer's liability must be resorted to; (2) the District Director or someone under his direction and control familiar with the rules, regulations and procedures involved in the civil or criminal investigation of an individual's income tax liability appear at the trial to testify thereto; (3) the District Director appear as a witness and bring with him "the names of any and all individuals indicted for tax fraud by reason of their receipt of political donations from 1950 to the present." Subpoenas (1) and (2) are substantially the same. Apparently appellant hoped to secure information which would show that the Internal Revenue agents had not been faithful to their own departmental rules in their investigation of appellant, appellant seeking thereby to cast doubt upon the accuracy or bona fides of the Government's allegation of tax evasion. The trial court was well within its discretion in quashing these subpoenas which called for the appearance at trial of the persons summoned with the items commanded to be brought by them. If the subpoenas had not been quashed, the trial would have been bogged down on inquiries unreasonably far afield and widely collateral to the essential question of appellant's guilt. Compare Fed. R.Crim.P. 17(c) and Gilmore v. United States, 256 F.2d 565, 567–568 (5 Cir. 1958). We think this is a proper case in which the Government could utilize the "net worth" method of proof, for the taxpayer's failure to keep adequate books and records certainly furnishes a sufficient basis, without more, to justify a resort to the "net worth" technique.[9]

---

**8.** Mr. Langford: If the Court please, Mr. Ungerman is offering a purported summary of the evidence which he says the defense has established, and the witness isn't even finished with direct examination. This is an untimely offer.
The Court: Objection sustained. There is no basis at this time.

Mr. Ungerman: Exception.
The Court: Have the witness testify to facts, and then I will consider the matter of the summary.

**9.** Justice Clark's opinion for the Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) demon-

The record is replete with unchallenged uncontradicted evidence that appellant failed to keep adequate records of his personal finances and of his disbursement of political funds.

■ Also, the trial court's quashing of the third subpoena was not error. Partially by means of information to be obtained as a result of this subpoena appellant hoped to show that he had been "singled out" for prosecution, i. e., that the tax evasion laws had not been enforced evenhandedly in the Northern District of New York against political leaders who had diverted party funds to their own benefit. Reliance is placed upon Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886) and People v. Utica Daw's Drug Co., 16 A. D.2d 12, 225 N.Y.S.2d 128, 4 A.L.R.3d 393 (4th Dept. 1962). The evidence appellant hoped to obtain from the District Director would prove only half of his contention, namely, that no one had been prosecuted; he would still have to show that unprosecuted political leaders had diverted political funds. At the time the subpoena was quashed defense counsel represented to the court that he had

subpoenaed several political leaders who had acted in a manner similar to defendant and had not been prosecuted. The judge, relying upon counsel's representations, then indicated that he would not quash these subpoenas summoning the political leaders, and he further observed that they could also testify whether any assessments of unpaid taxes or claims of tax evasion had ever been made against them, thus making it unnecessary to obtain the same information from the District Director.[10] However, no political leaders were ever produced. Therefore, inasmuch as the issue was never reached, we need not pass upon the question as to whether subpoenas such as appellant claimed to the trial judge he had issued ought to be quashed, and, in view of the judge's indication that he would permit such witnesses to so testify if appellant presented them, appellant suffered no prejudice from the quashing of the subpoena that had been issued to summon the District Director.

■ Finally, in two assignments of error which appear to us to be substantially the same, appellant urges that his motion to set aside the verdict on

strates that the classical situation for invoking the "net worth" method of proof is the one where the taxpayer has concealed income by destroying records or by keeping no records. Id. at 126, 130–131, 75 S.Ct. 127. In *Holland* it was established that the method may even be used in some situations where the books and records of the taxpayer are apparently adequate. Id. at 130–132, 75 S.Ct. 127.

10. Mr. Ungerman: On the first subpoena you quashed, it was our intention to prove that there had been a discriminating type of prosecution against the defendant in this action by reason of the fact that there are countless situated similar as he is who have taken political funds, used them as similar as he did, to the knowledge of the Internal Revenue Service at one point and no assessment of tax or any claim of evasion of tax was made against these individuals.

My second offer as proof is that in order to—

The Court: Can you state the individuals to whom you refer?

Mr. Ungerman: I am going to have them on the stand. I have them under subpoena.

The Court: Pardon me?

Mr. Ungerman: I have several under subpeona.

The Court: Then they will be able to supply the information. They know whether they have been indicted.

Mr. Ungerman: Not necessarily whether they have been indicted, whether they have ever been charged with having failed to report taxable income that should have been reported.

The Court: Is there any allegation that they used it for their own purpose?

Mr. Ungerman: That I will have to ask them this question, but I am sure the Court is familiar with the Stratton case.

The Court: I am familiar with the Stratton case which indicates that even though a public officeholder is in a high position as governor of the state, if there is any basis for prosecution it is assumed that the United States will prosecute even though it might be unsuccessful.

count 3 as being against the weight of the evidence should have been granted. In short, he contends that the Government did not establish beyond a reasonable doubt that the funds given to appellant in good faith as political contributions had not been expended in furtherance of party interests. We should note that whether a jury can find tax evasion beyond a reasonable doubt where the net worth plus non-deductible expenditures method of proof is used is a very difficult determination for an appellate court to make upon a cold record; most of the evidence in such a record is circumstantial and an evaluation of it is often influenced by determinations of witness credibility which we are in no position to review. However, after a thorough appraisal of the record and after viewing the evidence in the light most favorable to the Government as we must after a conviction, we have concluded that there was sufficient credible evidence for the jury to have concluded beyond a reasonable doubt that appellant treated the contributions here involved as his own monies, assumed complete dominion over them, and spent or invested them purely for his own advantage and in his own interest. In view of appellant's conflicting versions as to whose money he had, invested in the Cohoes Publishing Corporation, his failure to inform appropriate persons that the investments were really those of the Democratic Committee, his proclivity to commingle the Committee's funds with his own, and his failure to keep adequate records regarding disbursement of party funds, we are unwilling to say that the jury erred in finding that appellant used the political contributions other than in furtherance of party business. Moreover, there is no merit to appellant's additional claim that the prosecution did not adequately distinguish between the funds contributed to appellant in 1960 and those contributed in 1961, and that therefore the jury erroneously may have considered the 1960 contributions as part of the funds not reported in the 1961 return. The argument is not a valid one for these funds were reportable by appellant not in the year of contribution, but in the year of diversion. Therefore, it was sufficient that the Government show, as it did, that the increase in appellant's net worth from the end of 1960 to the end of 1961 plus the non-deductible expenditures for 1961 was considerably greater than the amount of the income he reported for 1961. Compare Holland v. United States, 348 U.S. 121, 129, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (steadily increasing net worth must be "reasonably allocated" to the appropriate tax year).

### GENERAL POINTS

There remain three general assignments of error. First, it is urged that certain evidentiary materials and certain testimony by government agents resulted from information elicited from the appellant in the absence of his retained counsel at a time the Government knew appellant had a retained counsel, and therefore those materials and that testimony ought not to have been admitted into evidence. He maintains that the exclusion of this evidence is required by the holding in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), as explained in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). And see Mathis v. United States, 391 U.S. 1, 88 S.Ct. 1503, 20 L.Ed.2d 381 (May 6, 1968). However, the record discloses [11] that appellant was warned of

---

11. The important pertinent facts gleaned from the record are as follows:

June 28, 1962—Federal agents visited appellant at his office and informed him that his income tax liabilities for 1958–61 were being investigated, that he need not respond to questions which might incriminate him, and that he had a right to counsel. Appellant refused to answer any questions, stating that he wished to have his attorney present.

July 2, 1962—Agents again visited appellant at his office, again told appellant he need not answer any questions, and asked him if he didn't want his attorney there before answering

his right to counsel and his right to remain silent upon each of the first two occasions he was confronted by federal agents in connection with this case, and in fact relied upon those rights at interviews prior to the interviews during which he made the damaging statements later used against him. Moreover, the three interviews during which these damaging statements were made occurred, respectively, at appellant's home, at the office in the Justice Department, Washington, D. C., of the Government's trial attorney in this case, and at the Albany office of the United States Attorney for the Northern District of New York, all at times prior to appellant's indictment and arrest. Thus it appears that there are two basic weaknesses in appellant's argument for exclusion of appellant's admissions. First, on each of these occasions, appellant was neither in custody nor restrained of his freedom of action in any significant way, so that the inherently compulsory surroundings which put the privilege against compelled self-incrimination in jeopardy did not exist in this case; therefore, the *Escobedo-Miranda* exclusionary rule has no application here. As we noted quite recently, "the view that the *Miranda* requirements do not apply to noncustodial questioning by IRS agents has been adopted by every Court of Appeals which has passed on this question and by a majority of the District Courts which have done so." United States v. Squeri, 398 F.2d 785 (2 Cir. July 24, 1968). And see cases cited therein. Second, appellant was informed of his right to counsel at both his first and second confrontations with revenue agents[12] and in fact invoked that right several times; this indicates that he was consciously aware of the right. The fact that he abandoned his earlier tight-lipped policy toward revenue agents and spoke freely at his later confrontations with them is unquestionably a conscious, intelligent waiver of his known constitutional rights. We cannot agree that he traveled all the way to Washington, or even to Albany, without counsel, just to inform the Government that he had no counsel with him.

---

any questions. Appellant replied that he had not been able to reach his attorney but wished his accountant, who was present, to remain during the interview. He answered some questions, mostly dealing with his personal history, but declined to answer other questions outside the presence of his attorney.

July 25, 1962—Agents visited appellant at his office, interviewed him in the presence of his attorney, and appellant again refused to answer certain questions.

March 13, 1963—Agents interviewed appellant at the office of and in the presence of his attorney.

April 12, 1963—Agents visited appellant at his home to deliver a letter from the Regional Office of the Internal Revenue Service germane to the investigation. Appellant asked them how the investigation was coming along, to which they responded there was a discrepancy between net worth and reported income, and appellant thereupon made some of the statements later used against him.

October, 1964—Appellant, having requested an appointment, visited the Attorney prosecuting his case at the Justice Department in Washington, and told him he came without counsel because his counsel wanted an additional fee of $10,000 for making the trip to Washington. He then made additional statements which were used against him at trial.

April 7, 1965—Appellant, alone, met with a federal agent and the United States Attorney for the Northern District of New York at the latter's office in Albany and again made damaging statements later used against him.

12. Because trial in this case was commenced prior to June 13, 1966, the date Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), was handed down, we are not concerned that the warnings prescribed in *Miranda* were not given here *in haec verba*. See Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). With that in mind, we need only pass upon appellant's limited contention that he should not have been questioned unless in the presence of his counsel.

Appellant's penultimate point is that the trial court erred at the pre-trial suppression hearing in refusing to suppress certain information and materials, which he alleges the Government obtained from him through deceit, fraud, and trickery, and to suppress the "fruits" thereof. He maintains that, during the investigation which preceded this prosecution, there was an oral agreement between federal agents and his then-counsel whereby he would hand over certain papers and records to the agents in exchange for whatever information the Government had already collected on the case, so that a compromise might be worked out, but that, after appellant had complied, the Government had reneged on its part of the bargain. The evidence on this point at the suppression hearing was in conflict and the court resolved the conflict by finding that appellant had voluntarily turned the materials over to the Government for photostating. Appellant suggests no basis upon which to upset this finding of fact, and we have discovered none in the record.

Also, we reject appellant's last suggestion that unfavorable publicity prevented him from having a fair trial. At the end of each court session the judge painstakingly admonished the jury to avoid reading about the trial in newspapers or listening to accounts of it on radio or on television. Moreover, during the trial appellant's trial counsel failed to call the allegedly adverse publicity to the attention of the trial court and failed to request that the court adopt any protective measures, nor did appellant move for a mistrial or a new trial on this ground, nor ask that the jury be sequestered, nor even ask that the jury be polled in order to discover whether any juror had disobeyed the judge's admonitions. This issue may not be raised for the first time on appeal. Compare United States v. Ragland, 375 F.2d 471, 476 (2 Cir.1967), cert. denied, 390 U.S. 925, 88 S.Ct. 860, 19 L.Ed.2d 987 (1968) (claim of excessive pre-trial publicity must be raised before or during trial). In any event, the stories about appellant's trial were apparently true, though typically written for newspaper readers, and appellant fails to cite a single instance in which the information made public differed from the evidence presented in court.

We would be remiss not to add a short note commending the trial judge for the conduct of this case. Although the trial was lengthy and aroused great public interest, and the facts and issues were quite complex, he at all times maintained absolute control of the proceedings. As can be seen from our discussion of the issues presented to us and from our rulings thereon, he was always attentive to the issues presented to him and was effectively incisive in dealing with trial counsel's arguments.

The conviction is affirmed.