**UNITED STATES of America,
Appellee,**

v.

**Stanley GARELLE and Martin Zimmerman, Appellants.**

**Nos. 189, 190, Dockets 34799, 35125.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 18, 1970.

Decided Oct. 13, 1970.

On Rehearing Dec. 3, 1970.

Certiorari Dismissed March 19, 1971.

See 91 S.Ct. 1040.

David F. Dobbins, New York City (Royall, Koegel & Wells, James M. Pape, New York City, of counsel), for appellant Garelle.

Ronald Gene Wohl, New York City, for appellant Zimmerman.

David A. Luttinger, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of N. Y., Allan A. Tuttle, Asst. U. S. Atty., of counsel), for appellee.

Before WATERMAN, MOORE, and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

On October 23, 1968, appellants Martin Zimmerman and Stanley Garelle were charged in the first count of a three-count indictment with conspiring with seven co-defendants, five co-conspirators not indicted, and unknown others, to import, conceal, and sell a large quantity of hashish in violation of 21 U.S.C. § 176a.[1] After an eight-day jury trial before Judge Harold Tyler in the Southern District of New York, both Zimmerman and Garelle were found guilty.[2] On February 20, 1970, Judge Tyler sentenced each defendant to a minimum mandatory prison term: five years for Zimmerman as a first offender; ten years for Garelle because Judge Tyler found that he had committed a second offense under the federal narcotics laws.[3] Zimmerman and Garelle appeal from their convictions. Garelle urges also that he was wrongly sentenced as a recidivist.

Viewing the government's evidence in a light most favorable to the prosecution as we are required to on this appeal, United States v. Dawson, 400 F.2d 194, 205 (2d Cir. 1968), cert. denied, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969); United States v. Kahaner, 317 F.2d 459, 467 (2d Cir. 1963), cert, denied, sub nom. Corallo v. United States, 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963), it portrayed Zimmerman as one of three manager-directors of an illicit multi-national venture centered on a small Spanish island in the western Mediterranean Sea called Ibiza.

Zimmerman traveled to Ibiza from New York City in the Spring of 1966. Between that time and May of the following year, Zimmerman and two American compatriots, Robinson and Dickason, arranged at least three shipments of hashish from the island to the United States.[4] Proceeds from the last of these deliveries permitted the three friends to undertake a new, more ambitious project.

On May 19, 1967, Zimmerman, Robinson and Dickason embarked on an odyssey that took them first to London and Paris for money,[5] and then by airplane

---

1. The other counts charged five of the named defendants in the conspiracy count with the substantive crime of receiving, concealing, selling, etc., the hashish after it had been brought into the country.

2. The cases against the other defendants were severed.

3. Sentences were imposed pursuant to 21 U.S.C. § 174:
"For a second or subsequent offense * * * the offender shall be imprisoned not less than ten or more than forty years. * * * "

4. Additionally, there was evidence that Zimmerman sent some heroin tablets from England to defendant-conspirator Gerry Abrams in early 1966.

5. A $2500 payment deposited in a Paris bank in payment for the third shipment of hashish was converted into travelers checks by Dickason; Zimmerman sold the check in London for $2200 while Dickason

and freighter to Kathmandu, Nepal in the Himalayan Mountains. There, toward the middle of June, the trio arranged with suppliers known to Zimmerman for the purchase of some twenty-eight pounds of hashish for $300. From Nepal, the narcotics were carried by a girl named Tanya, accompanied by Dickason, to New Dehli, India. Zimmerman there had the hashish sewn into the bottom of three suitcases and completed plans for selling the drugs in Montreal, Canada.

As early as the planning stage of the trip in Ibiza, Stanley Garelle was one of two persons identified by the three adventurers as the intended buyers for the Nepal hashish. In New Delhi, Zimmerman arranged to sell half the narcotics to Garelle and half to another New York City resident, Gerald Abrams. In two conversations, one on June 19 or 20 and the other on June 22, 1967, Garelle enlisted a friend, Arnold Cohen, to pick up Garelle's share from Dickason in Montreal. According to plan, Dickason smuggled the hashish into Montreal by plane, where, after some confusion over the meeting place, Cohen and Abrams divided the contraband between them. Disregarding Garelle's instructions to return to New York by bus to avoid the chance of a thorough border search, Cohen rented a car and stuffed the hashish under the front seat, where it was subsequently discovered by United States Customs agents as Cohen attempted to cross the border at Rouses Point, New York.

## I.

■ Zimmerman objects to two aspects of his trial. First, he characterizes as unjustly prejudicial the government's introduction in evidence against him of two letters, purportedly written by Zimmerman. A related suggestion

is that Judge Tyler should not have permitted the government's effort to attribute these letters to Zimmerman's hand by putting in evidence an exemplar of his writing along with certain other supporting documents. That the two letters were relevant to the government's case is plain. One, taken from an alleged co-conspirator, Gerald Abrams, upon his arrest, alluded to the presence of another co-conspirator (Jane Abrams) on Ibiza. This letter also corroborates testimony of co-conspirator Barry Kessler, concerning one of the alleged shipments of hashish sent prior to the trip to Nepal.[6] The second letter, seized after the arrest of another alleged co-conspirator, Stuart Greenhaus, apparently prescribed the method by which Greenhaus would make payment for still another shipment of drugs (hashish and opium), this time from Rome. Both letters thus established a relationship between Zimmerman and other alleged conspirators. In addition, the first letter corroborated the testimony of a key witness. Each was well "worth consideration by the jury," 1 Wigmore, Evidence § 29 at 411 (3d ed. 1940) and hence admissible, unless we can say that Judge Tyler abused his discretion in refusing to exclude them as unduly prejudicial. Although both letters do refer to sales of hard narcotics, and thus suggest criminal activity not charged in the indictment, "evidence relevant to the proof of one crime is not incompetent because it discloses the commission of another." United States v. Eury, 268 F.2d 517, 520 (2 Cir. 1959); United States v. Kahaner, *supra.*

■ To lay a foundation for the admission of the letters, the government secured an order from the trial judge directing Zimmerman to provide a sample of his writing. When Zimmerman refused to comply with the order,[7]

---

was reimbursed for the "lost" checks in Paris.

6. Kessler testified to Zimmerman's allegation that Kessler was trying to "beat" him by withholding payment for hashish shipped to Kessler in 1966. They settled for

about $100 of the $680 claimed by Zimmerman. The letter says: "barry K you know BEAT me—gave me $120—i expected *680 * * *.*"

7. Zimmerman did consent to give an exemplar during the trial, just before the gov-

the government introduced a letter taken from Zimmerman upon his repatriation to the United States from Beirut in January, 1966. The partial signature "Martin Zi * * *" appears at the bottom of this exemplar. The government also introduced Zimmerman's repatriation file to establish that the contents of the letter corresponded with facts about Zimmerman's recent life recorded in his file. The exemplar was clearly "admissible * * * to determine [the] genuineness of other handwriting attributed to * * *" Zimmerman. 28 U.S.C. § 1731. See United States v. Swan, 396 F.2d 883 (2d Cir.), cert. denied, 393 U.S. 923, 89 S.Ct. 254, 21 L.Ed.2d 259 (1968); United States v. Liguori, 373 F.2d 304 (2d Cir. 1967).

## II.

■ Zimmerman next contends that a delay of four months and twenty-two days, between his arrest on August 7, 1969, and his trial which began on December 29, deprived him of his Sixth Amendment right to a "speedy" trial. A review of the circumstances surrounding the faulted period, United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966), fails to disclose any factor favorable to Zimmerman's claim. See United States ex rel. Solomon v. Mancusi, 412 F.2d 88, 90 (2d Cir.), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969) (relevant factors include possible waiver for failure to object, length of delay, prejudice to defendant, and reasons for delay). It is of interest that Zimmerman's counsel made no complaint of delay until December 16, when the trial was moved from its tentative starting date of December 18 to December 29, in order to accommodate co-counsel. See United States v. Lustman, 258 F.2d 475, 478 (2d Cir.),

cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958). Moreover, the time between arraignment and trial here does not approach the elapsed period in any case in this jurisdiction where denial of an adequately "speedy trial" has been found. E.g., United States v. Lustman, *supra* (four years); cf. Hodges v. United States, 408 F.2d 543 (8th Cir. 1969) (about 18 months). Further, defendant has shown nothing to indicate that he was affected in the slightest by this short delay and we view his argument as hypertechnical and barren. There were no elements of purposefulness or oppressiveness present here, Pollard v. United States, 352 U.S. 354, 361, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957). Indeed, the "delay" was attributable solely to the length of a trial over which Judge Tyler was then presiding.[8]

## III.

Garelle contests the government's introduction in evidence of an address book taken by a Bureau of Customs agent from alleged co-conspirator Robinson's luggage on August 5, 1967, during an interrogation and search of Robinson at Rouses Point. On the letter "A" page of the listed addresses, and obviously not in alphabetical order, the name and address of Garelle appears directly beneath the entry for "Jerry Abrams." Just below Garelle's address a notation reads "Ask about Mel." "Mel Knee" was an alias used at times by Zimmerman.

■ Garelle concedes that the notebook would be admissible as circumstantial evidence of a conspiracy among those named in it, see United States v. Armone, 363 F.2d 385 (2d Cir.), cert. denied, Viscardi v. United States, 385 U.S. 957, 87 S.Ct. 391, 17 L.Ed.2d 303

---

ernment called its handwriting expert to testify as to the singlehanded authorship of the letters and exemplar. On March 11, 1970, Judge Tyler sentenced Zimmerman to a five-day term to run concurrently with his sentence in the conspiracy case, for contempt of the order to produce an exemplar.

8. The instant case was assigned to Judge Tyler in October pursuant to a noteworthy experimental project under which a single judge would supervise all aspects of a criminal trial, from pretrial activity to sentencing.

(1966), but argues that its use here violated his Sixth Amendment right to confront and examine in the courtroom the witnesses against him.

We think the argument fails on several grounds. First, we perceive no justification for Garelle's construction of a portion of the government's summation as an "election" to treat the address book as "testimonial," rather than "circumstantial" proof. Garelle does not question the vitality of the rule that "when a member of a conspiracy is arrested, even after termination of the conspiracy, names and addresses found upon him or in his premises are admissible as circumstantial evidence * * *" of an agreement among the conspirators thus linked. United States v. Bennett, 409 F.2d 888, 895 n. 6 (2d Cir.), cert. denied sub nom. Haywood v. United States, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969). This rule is no esoteric peculiarity of conspiracy law; it represents the common sense notion that people whose names are associated together in writing in this way are somewhat more likely for that reason to be associated also in other ways. Although the inference is usually less than compelling, more direct proof of association among conspirators is often difficult to produce in court. See Developments in the Law: Criminal Conspiracy, 72 Harv.L.Rev. 920, 984 (1959); Nye & Nissen v. United States, 168 F.2d 846, 857 (9th Cir. 1948),[9] aff'd, 336 U.S. 613, 69 S.Ct. 766, 93 L. Ed. 919 (1949). In this case, the relevance of the notebook was enhanced by the peculiar location of Garelle's name and by the suggestive notation beneath it.

Garelle's authority for his contention that the Sixth Amendment required exclusion of this pertinent evidence illustrates by contrast the correctness of the ruling below. Thus, in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), not a conspiracy case, a very damaging confession by one of two defendants, which inculpated the second, was improperly admitted at their joint trial. The Supreme Court held that a limiting instruction could not be depended upon to undo the grave damage to the second defendant's case.[10] The Court specifically emphasized in a footnote "that the hearsay statement inculpating petitioner was clearly inadmissible against him under traditional rules of evidence." Id. 128 n. 3, 88 S.Ct. at 1623. In other precedent relied on by Garelle, reversals on Sixth Amendment grounds have been triggered by the admission of similar extraordinarily prejudicial hearsay evidence,[11] whose probative worth was substantially dependent on the declarant's veracity, credibility, sincerity, and memory.[12] Since the evidentiary value of the address book bears virtually no relation to such qualities of its author or authors, the value of the testimony of the unidentified persons who put the entries in the book would be correspondingly slim.

## IV.

Although we affirm Garelle's conviction, we are persuaded that he must be resentenced. At sentencing before Judge Tyler on February 20, 1970, the government filed an information charging Garelle with a previous federal narcotics conviction on January 4, 1966,

9. "In a conspiracy case, wide latitude is allowed [the government] in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged."

10. The Court thus overruled Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957).

11. E. g., Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)

(prosecutor at trial of petitioner read extensively from document purported to be a confession of an alleged accomplice convicted earlier); United States v. Williams, 424 F.2d 344 (5th Cir. 1970) (key expert testimony based on complex records whose accuracy was undemonstrated).

12. Cf. Mattox v. United States, 156 U.S. 237, 242–243, 15 S.Ct. 337, 39 L.Ed. 409 (1895).

in the Southern District of California. Garelle readily admitted that he had in fact pleaded guilty to a charge of "aiding and abetting the importation of 79 pounds of marihuana in violation of 26 U.S.C. sec. 4755(a) (1)." While conceding the conviction, Garelle objected on two grounds to Judge Tyler's use of it for sentencing him as a repeater.

First, Garelle proposed the ingenious but untenable theory that the violation presently under review should be determined to have occurred at least as early as January 1, 1966. This was the date specified in Count One of the indictment as the starting date of the conspiracy. The "earlier" conviction on January 4, 1966, must therefore, according to Garelle, be viewed as the later. Consequently, Garelle cannot be sentenced as a second offender now.

Although we perceive that difficult questions might arise in a closer case, to dispose of the present claim it is sufficient to observe that in proving Garelle's guilt to the satisfaction of the jury the government relied on no evidence of deeds or words by any conspirator or anyone else that can be dated before January 4, 1966. Thus, the jury verdict here necessarily implies that Garelle committed every element of the crime subsequent to the California conviction. Evidence concerning the specific crime on trial is enough for one proceeding. We cannot conceive of any duty on the part of the trial court to conduct a hearing to determine if Garelle, in connection with the offense charged, also may have committed criminal acts earlier than those proven. Judge Tyler's finding that Garelle was a recidivist was inevitable.

We remand Garelle's case for resentencing, however, because we believe that Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), has undermined Garelle's earlier narcotics conviction.[13] In Leary, the Supreme Court held that a plea of the fifth amendment privilege against self-incrimination furnished a complete defense to a prosecution for failure to secure a written order form and to pay a tax before effecting a transfer of marihuana, as required by 26 U.S.C. §§ 4741, 4742. Companion provisions, 26 U.S.C. §§ 4751, 4753, require that any person, who inter alia "imports" or "deals in" marihuana must first register his "name or style and his place or places of business" with the Internal Revenue Service and pay an annual occupational tax. Garelle was convicted in 1966 for failure to comply with the occupational registration and tax requirements. It seems to us beyond serious dispute, and indeed the government has not argued otherwise, that Garelle could not have imported marihuana, registered as prescribed and paid the tax, without incurring a "real and appreciable" risk, Marchetti v. United States, 390 U.S. 39, 48, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), of providing both state and federal officials with incriminating evidence against himself.[14]

Moreover, we are foreclosed from adopting the government's attempt to distinguish Leary. Garelle, it is said, as only a potential importer could have complied with the registration law and also avoided self-incrimination simply by

---

13. Three threshold issues would warrant our discussion had they not recently been settled in this jurisdiction. In United States v. Liquori, 430 F.2d 842 (1970), we held that Leary is retroactive, that an "assertion of the privilege [recognized in Leary] on collateral attack" is timely, and that a "guilty plea [does] not waive [a petitioner's] privilege against self-incrimination. * * * "

14. For example, the importation might very well have supported a prosecution under

21 U.S.C. § 176a (smuggling of marihuana). Once the marihuana was inside the country, possession would probably have been criminal in every state. See Leary v. United States, 395 U.S. 6, 17, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969). Moreover, 26 U.S.C. § 4775 requires that the IRS furnish a list of persons taxed pursuant to § 4751 "upon written request, to any person." Cf., e. g., Leary, supra, 395 U.S. at 16, 27, 89 S.Ct. 1532, 23 L. Ed.2d 57.

refraining from bringing the marihuana across the Mexican border.[15] The Supreme Court rejected a substantially similar argument two years ago in Marchetti v. United States, *supra*. After *Marchetti* the rule is that the fifth amendment privilege must be taken as atemporal: the only question for us is how great would have been the danger of incrimination, regardless of whether the inculpatory evidence would point forward or backward in time. See Note, The Supreme Court, 1967 Term, 82 Harv. L.Rev. 63, 199 (1968).

■ Since, given *Marchetti*, no facts that might emerge at a new hearing could save the 1966 conviction, neither justice nor judicial efficiency would be served by remitting Garelle to collateral remedies, as the government urges.[16] We remand Garelle for resentencing.[17]

### On Petitions for Rehearing

### PER CURIAM:

On October 13, 1970, we affirmed the conviction of appellant Stanley Garelle for conspiracy to violate 21 U.S.C. § 176a. However, we remanded Garelle's case for resentencing because we believed that he had been improperly sentenced as a second offender under the federal narcotics laws, finding that a prior conviction under 26 U.S.C. § 4755(a)(1) was vitiated by the principles announced in Leary v. United States, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969).

■ Both the Government and Garelle have petitioned this panel for a rehearing. We deny Garelle's petition but grant that of the United States and, upon rehearing, modify our previous order. The Government in its petition for the first time suggests that particular facts concerning Garelle's January 4, 1966, guilty plea to the earlier narcotics conviction will show that he in fact knowingly and willingly waived his right to raise a defense of self-incrimination. Accordingly, Garelle's case is remanded for a hearing in the district court to determine whether there was in fact a waiver of that right. If the District Judge finds a waiver, then there will be no need for resentencing. If no waiver occurred then the District Judge will resentence Garelle as provided for in the earlier opinion.

15. United States v. King, 307 F.Supp. 217 (S.D.Cal.1969).

16. See McClain v. United States, 417 F.2d 489, 493 (9th Cir. 1969), cert. denied, 397 U.S. 965, 90 S.Ct. 996, 25 L.Ed.2d 257 (1970). We also reject the government's assertion that Garelle's objection to the use of the prior conviction for enhancing his sentence was "perfunctory" and "desultory" and hence inadequate. We believe that the trial judge was adequately informed of the objection and the basis for it by defense counsel's simple assertion of "an invalidity in the earlier conviction" because of *Leary*, particularly in view of a colloquy between Garelle's counsel and the court which had occurred earlier in the trial. At one point, counsel raised *Leary* as an objection to the conspiracy prosecution itself. When he offered to expand on his argument, Judge Tyler replied:

"No. I am familiar with it. Any half-way alive person, or a person who is not absolutely comotose, in this building these days is familiar with this argument specifically. * * *

*   *   *   *   *
*  *  * I understand you. This argument is made constantly.
*   *   *   *   *
I don't mean to demean you or your argument. It is just that I am so familiar with it that I don't think there is any point in asking you or anybody else to take the time on it."
Record at 794–795.

17. On this appeal, Garelle has also objected to the court's ruling that the government would be permitted to impeach Garelle by introducing evidence of the prior conviction if Garelle had taken the stand; because of this, he insists, he failed to testify. However, Garelle did not then object to the proposed impeachment on the grounds of *Leary*, but as we perceive it on general grounds of prejudice. Accordingly, we cannot regard Judge Tyler's refusal to forbid the impeachment on grounds now urged for the first time (*Leary*), as "plain error." F.R.Crim.P. 52.