**ACEMLA, Latin American Music and Latin American Music Inc., Petitioner,**

v.

**COPYRIGHT ROYALTY TRIBUNAL, Respondent.**

**American Society of Composers, Authors and Publishers, Broadcast Music, Inc., and SESAC, Inc., Intervenors.**

**No. 687, Docket 84–4136.**

United States Court of Appeals, Second Circuit.

Argued Feb. 21, 1985.

Decided May 30, 1985.

As Amended June 11, 1985.

Mark W. Pennak, Appellate Staff Atty., Civ. Div., Dept. of Justice, Washington, D.C. (William Kanter, Appellate Staff Atty., Richard K. Willard, Acting Asst. Atty. Gen., Washington, D.C., of counsel), for respondent Copyright Royalty Tribunal.

Jose Luis Torres, New York City (Torres & Leonard, P.C., New York City, of counsel), for petitioners.

I. Fred Koenigsberg, New York City, for intervenors American Soc. of Composers, Authors and Publishers, Broadcast Music, Inc., and SESAC, Inc.

Bernard Korman, New York City, for American Soc. of Composers, Authors and Publishers.

Edward W. Chapin, New York City, for Broadcast Music, Inc.

Nicholas Arcomano, New York City, for SESAC, Inc.

Before VAN GRAAFEILAND, WINTER and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This is the tale of a bureaucratic Garden of Eden *. In 1977 congress created a new governmental paradise, called Compulsory Royalty Fees, and placed in it the Copyright Royalty Tribunal (CRT) to collect the fees and distribute them among those who might be entitled to them. Blessed with all the authority and discretion any governmental agency could ask for, the CRT was even granted the power to determine its own income by fixing the amount of fees to be collected.

As in Eden, the "creator" laid down a rule—here actually, two rules—for distributing the bounty of this paradise. Like Adam and Eve, the CRT has disobeyed the rules; unlike Adam and Eve, however, the CRT is not to be banished from Paradise but, instead, will be given a second oppor-

tunity to fulfill its mission—this time, we hope, in full compliance with the rules.

Petitioners claim that the CRT's 1982 Jukebox Royalty Distribution Determination wrongly denied them a share of the royalty fees collected from jukebox operators. Finding that the CRT's determination was not in accordance with law, we vacate the determination as to the disputed ten percent of the fund and remand for further proceedings.

## I. Background

In 1909 when congress passed the first copyright law, the reproduction of musical performances on coin-operated machines was deemed not to constitute a public performance for profit unless a fee was charged for admission to the place where the reproduction occurred. As a result, there was no copyright infringement when records were played on most jukeboxes and, of course, no royalty fees were paid. House Rep. No. 1476, 94th Cong., 2d Sess. 111–12, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5727. To eliminate this "unconscionable", "grossly discriminatory", and "totally unjustified" exemption from copyright protection, *id.*, congress in 1976 abolished this so-called "jukebox exemption" and provided in 17 U.S.C. § 116 (1982) for the collection and distribution of annual royalty fees to be paid by jukebox operators for compulsory licenses which entitle them to use all copyrighted records in their jukeboxes. 17 U.S.C. § 116(a)(2).

The royalty fees, whose amount is fixed by the CRT, 17 U.S.C. § 801(b)(1), are paid to the Register of Copyrights and then, after a deduction to cover the costs of the copyright office, are deposited in the United States Treasury. 17 U.S.C. § 116(c)(1). Ultimately, it is the responsibility of the CRT, an independent agency established "in the legislative branch", 17 U.S.C. § 801(a), to distribute the fund annually. "[I]n cases where controversy exists" the CRT must determine "the distribution of such fees." 17 U.S.C. § 801(b)(3).

---

* See generally, Genesis Chs. 2 and 3.

This appeal is the first court challenge to the CRT's distribution of a jukebox fund. While there have been disagreements among competing claimants in prior years, those disputes were ultimately resolved either by agreement or, as in 1981, by acquiescence in the CRT's distribution order.

The 1982 fund at issue here totalled approximately $3,000,000. We were told on oral argument that the fund for 1984 would be approximately $6,000,000. In view of the rapidly increasing annual amount in the jukebox fund available for distribution by the CRT, it is particularly important not only for this appeal, but also for future distribution proceedings, to focus carefully on those few statutory limits that congress has placed on this unique agency. Thus, on this maiden courtroom voyage for the jukebox fund distribution statute, we proceed cautiously, having a special regard for the objectives congress sought to achieve.

## A. *Statutory Scheme for Distribution of the Fund.*

The Copyright Act and the CRT's regulations promulgated thereunder, 37 C.F.R. §§ 301.1 to 308.2, contemplate a yearly filing of claims by all persons who claim to be entitled to share in the net compulsory license fees collected for the past year. *See* 17 U.S.C. § 116(c)(2); 37 C.F.R. § 305.2 (1984). Claims may be filed by two classes of claimants: (A) copyright owners who are not affiliated with a performing rights society, 17 U.S.C. § 116(c)(4)(A), and (B) performing rights societies, 17 U.S.C. § 116(c)(4)(B). A "performing rights society" is defined as "an association or corporation that licenses the public performance of nondramatic musical works on behalf of the copyright owners, such as the American Society of Composers, Authors and Publishers, Broadcast Music, Inc., and SE-SAC, Inc." 17 U.S.C. § 116(e)(3). The three societies named in this statutory definition are the intervenors on this appeal.

The act gives claimants the opportunity to agree among themselves as to the portion of the fund to which each is entitled. They may do so without presenting to the CRT any data in support of an agreed-upon distribution, and such agreements are exempted from any prohibitions of the antitrust laws. 17 U.S.C. § 116(c)(2).

If adverse claims to the fund remain unresolved the CRT shall, after October 1 of each year, determine that a controversy exists. 17 U.S.C. § 116(c)(3). If the controversy relates to only a portion of the fund, the remaining undisputed portion may be distributed immediately. 17 U.S.C. § 116(c)(4)(C). As to any controversy, the CRT is instructed to conduct a proceeding to determine the final distribution of the fund. 17 U.S.C. § 801(b)(3). Distribution is to be made, first, to copyright owners not affiliated with a performing rights society, 17 U.S.C. § 116(c)(4)(A), with the remainder to be distributed to the performing rights societies as they shall agree, or failing agreement, the distribution shall be "the pro rata share to which such performing rights societies prove entitlement." 17 U.S.C. § 116(c)(4)(B).

Upon determining that a controversy exists, the CRT is required to publish in the Federal Register a notice of commencement of proceedings to determine the proper distribution. 17 U.S.C. § 804(d). Proceedings are to be initiated "without delay", and a final determination is to be rendered within one year of publication of the notice. 17 U.S.C. § 804(e). When a final determination is reached, the CRT must "state in detail the criteria * * * determined to be applicable to the particular proceeding, the various facts that it found relevant to its determination in that proceeding, and the specific reasons for its determination." 17 U.S.C. § 803(b). The CRT is free, however, to "adopt regulations, not inconsistent with law, governing its procedure and methods of operation." 17 U.S.C. § 803(a). Within thirty days of publication in the Federal Register of the CRT's final determination, an aggrieved party may seek judicial review by appeal to the United States Court of Appeals. 17 U.S.C. § 810.

B. *Distributions of the Funds for 1978 through 1981.*

The first distribution of the fund was for the year 1978. That year the only claimants were the American Society of Composers, Authors and Publishers (ASCAP), Broadcast Music, Inc. (BMI) and SESAC, Inc. (SESAC), who were the performing rights societies specifically mentioned in the act. As encouraged by congress, they reached a voluntary agreement on how they would share the fund. Under the statute, therefore, no proceeding was necessary, and the CRT distributed the fund according to the terms of the societies' agreement.

In 1979, an additional performing rights society, the Italian Book Company (IBC), claimed entitlement to a portion of the fund. Since no voluntary distribution agreement was reached the CRT declared a controversy and commenced a distribution proceeding in which each society presented evidence. ASCAP's evidence included a comparison of license revenues received by the different societies, comparisons of non-license revenues, and surveys showing performances in media other than jukeboxes. BMI presented a survey of jukebox performances, trade charts showing the popularity of copyrighted works, and a survey of radio performances of copyrighted works. SESAC based its claim of entitlement on its share of license revenues. IBC's submission stated that it owned the copyrights to a majority of Italian songs likely to be performed on jukeboxes located in pizza places. 46 Fed.Reg. 58,139, 58,-140–42 (1979).

The CRT rejected these submissions as an insufficient basis upon which to make a distribution. ASCAP's submission was "too general for us to find in it any guidance on how to distribute royalties". BMI's survey was "subject to * * * criticism and doubt concerning its methodology and execution". Consequently, the CRT requested the parties to "submit proposals for a joint survey" of actual jukebox performances. Instead of agreeing upon and conducting the requested survey, however,

the parties eventually reached a voluntary agreement for distributing both the 1979 and 1980 funds. While IBC did not join in those agreements, the CRT granted a separate award to IBC of $1,000 for 1979 and $800 for 1980 based upon prior submissions and "other distribution methodologies, such as the nature of the songs which are played in establishments in Italian-American communities." 47 Fed.Reg. at 18,406 (1982). No one sought judicial review.

The 1981 fund was distributed under a voluntary agreement reached by ASCAP, BMI, SESAC, and IBC. That year the petitioners on this appeal claimed entitlement to 9.5 percent of the fund, but their claim was rejected by the CRT, and no judicial review of that decision was sought. 47 Fed.Reg. 53,937 (1982).

C. *The Present Controversy: Distribution of the 1982 Fund.*

In January of 1983, nine claimants alleged entitlement to portions of the nearly $3,000,000 in the 1982 jukebox royalty fund. Four of them, ASCAP, BMI, SESAC, and IBC had reached a voluntary agreement as to the proper distribution among themselves. As a group they claimed entitlement to the entire fund. Of the remaining five claimants, two, Michael A. Walsh and Sammie Belcher, filed claims as individual unaffiliated owners of copyrights, but their claims were denied and they have not appealed. The remaining three claimants, ACEMLA, Latin American Music, and Latin American Music, Inc., sometimes collectively referred to herein as "LAM", submitted a single joint claim, seeking at least five percent of the fund. LAM alleged entitlement based on claimed interests in more than 20,000 copyrights to Spanish language songs.

D. *Proceedings Before the CRT.*

LAM's first justification statement, dated October 27, 1983, alleged entitlement to five percent of the $3,000,000 funds. Noting that obtaining empirical data on a national basis to show actual jukebox performances of each copyrighted work would

be prohibitively expensive, LAM claimed to hold licenses to a substantial number of copyrights to Spanish language songs and alleged that such songs were successful in the Hispanic market in the U.S. and Puerto Rico. Trade charts listing "hit songs" were submitted to show that "from January, 1982 through December 1982, there were a substantial number of hit songs in Spanish that represented LAM's copyrights." LAM stated that "most jukeboxes" tend to be located in bars and smaller restaurants in Hispanic communities and that, in light of the evidence submitted, the requested award of 5% of the fund would "not be unreasonable". Finally, pursuant to 37 C.F.R. § 305.4(a), LAM requested and was granted an extension of time in which to submit "additional matter with respect to the justification of their claim."

In its supplemental statement, filed on November 19, 1982, LAM referred the CRT to a study showing that Hispanics were heavier record buyers than "Anglos" and to an article noting the growth in record sales in the Spanish speaking market. LAM reiterated its claims that jukeboxes tend to be located in "less fancy restaurants and bars" and that "these establishments tend to exist in far greater numbers in poorer communities where, unfortunately, a large segment of the Hispanic population resides."

On December 13, 1983, the CRT declared the existence of a controversy over the proper distribution of the 1982 jukebox royalties. Simultaneously, the CRT determined, after reviewing the claims and the voluntary agreements, that approximately 90 percent of the fund should be distributed to ASCAP, BMI, and SESAC who, the CRT noted, "have received royalties in the several earlier jukebox royalty distributions". As to the remaining ten percent, the CRT also directed ASCAP, BMI, SESAC, and IBC to submit the justification for entitlement that they had earlier proposed. 48 Fed.Reg. 55,497 (1983).

Recognizing that it was "reasonable to conclude that Spanish music is played on jukeboxes", the CRT on January 25, 1984, directed that all claimants, including the parties to the agreement, submit statements showing what Spanish music was in their repertories. IBC disclaimed any copyrights of Spanish language songs. ASCAP, BMI, and SESAC submitted a single statement stating that collectively, they license virtually "all performances of copyrighted Latin language musical compositions in the U.S." In addition, they submitted a list of performances of Latin language musical works in media other than jukeboxes. This list included the sixteen "hit songs" highlighted in LAM's papers whose copyrights LAM claimed to administer. Of those sixteen songs, only ten were performed in the other media during 1982. Based upon this number of performances, when analyzed under ASCAP's and BMI's methods for determining performances, the LAM-administered songs would have been entitled to between $81 and $90 of the $3,000,000 fund.

LAM countered this submission with a statement, filed on April 23, 1984, attacking the probative value of the evidence submitted by ASCAP and BMI. LAM charged that the opposing parties' evidence consisted merely of self-serving, conclusory statements that did nothing to shed light on whether any of their copyrighted works were actually played on licensed jukeboxes in the year 1982.

E. *Decision of the CRT.*

The CRT's final decision was published in the Federal Register on August 31, 1984. 49 Fed.Reg. 34,555–56 (1984). It rejected LAM's claim entirely and concluded that the entire fund should be distributed to the settling parties, ASCAP, BMI, SESAC, and IBC, according to their agreement. Although the CRT acknowledged the difficult financial position of smaller claimants in establishing entitlement to the fund, it found that none of the evidence submitted justified an award to LAM. In support, the CRT stated that it found persuasive the evidence submitted by ASCAP and BMI in response to the trade charts submitted by LAM. *Id.* at 34,556.

LAM now appeals the denial of its claim. ASCAP, BMI and SESAC have intervened on the side of the CRT. IBC did not intervene, presumably because its small, $1,500 interest under its agreement with the other intervenors does not warrant further independent participation in these proceedings. Before us are issues of (A) our scope of review, (B) LAM's standing as a performing rights society, (C) whether the CRT improperly made a partial distribution of the fund, and (D) whether the CRT's distribution of the remaining 10 percent of the fund was in accordance with law.

## II. DISCUSSION

### A. *Scope of Review.*

Substantial portions of the briefs explore the proper scope of review for this appeal, an issue that in slightly different contexts, has received in depth consideration by other courts. *See e.g., Christian Broadcasting Network, Inc. v. CRT*, 720 F.2d 1295, 1304 (D.C.Cir.1983) (both arbitrary and capricious and substantial evidence standards applied to review of CRT's cable television royalty distribution order); *Amusement and Music Operators Association v. CRT*, 676 F.2d 1144, 1157 (7th Cir.) (arbitrary and capricious standard applied to review of CRT's jukebox fee adjustment proceeding), *cert. denied*, 459 U.S. 907, 103 S.Ct. 210, 74 L.Ed.2d 168 (1982). Because of the determination we have reached based on this record, however, it is unnecessary to consider closely our standard of review.

■ Section 810 of the Copyright Act provides for judicial review of any final decision of the CRT "in accordance with chapter 7 of title 5 [part of the Administrative Procedure Act (APA)], on the basis of the record before the Tribunal." 17 U.S.C. § 810. Under the APA this court shall set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, *or otherwise not in accordance with law*", 5 U.S.C. § 706(2)(A) (1982) (emphasis added), or, where an agency hearing is provided by statute, where the decision is "unsupported by substantial evidence", 5 U.S.C. § 706(2)(E).

The CRT argues strenuously in favor of a standard governed only by the "arbitrary or capricious" language. LAM does not dispute the applicability of that test but argues that the "substantial evidence" test must apply as well. Since our determination is that the CRT's distribution order was not arrived at "in accordance with law", there is no need to determine on this appeal whether failure to meet the substantial evidence test would be an adequate ground for reversal.

### B. *LAM's Standing as a Performing Rights Society.*

■ Both the CRT and intervenors argue that ACEMLA, Latin American Music, and Latin American Music, Inc. are not performing rights societies subject to the distribution provision of subsection (B) of § 116(c)(4), but instead are owners not affiliated with a performing rights society and therefore subject to the distribution provision of subsection (A). LAM correctly responds that this issue was not raised below and therefore is not properly presented for the first time on this appeal. *Terkildsen v. Waters*, 481 F.2d 201, 204–05 (2d Cir.1973); *Fortunato v. Ford Motor Company*, 464 F.2d 962, 967 (2d Cir.), *cert. denied*, 409 U.S. 1038, 93 S.Ct. 517, 34 L.Ed.2d 487 (1972); *United States v. Vitasafe Corp.*, 352 F.2d 62, 63 (2d Cir.1965) (per curiam); *Schwartz v. S.S. Nassau*, 345 F.2d 465, 466 (2d Cir.), *cert. denied*, 382 U.S. 919, 86 S.Ct. 294, 15 L.Ed.2d 234 (1965).

LAM further contends that had it been alerted to this claim before the CRT, it could have presented additional evidence to confirm its status as a performing rights society. We think it would be unfair to reject LAM's claim here based on an argument that was addressed neither by the intervenors before the CRT, nor by the CRT in its decision.

Moreover, the record provides substantial basis for regarding LAM as a performing rights society. In the statement of justification submitted to the CRT pursu-

ant to 37 C.F.R. § 305.4 LAM alleged that "[c]laimants are performing rights societies" that "own or administer more than 20,000 copyrights of traditional and popular Spanish language songs." This allegation was neither challenged by intervenors nor rejected by the CRT in its decision. On the contrary, the CRT treated LAM not as an unaffiliated owner, but as a performing rights society. Twice in its decision when it referred to LAM's claim the CRT contrasted LAM to *other* performing rights societies" (emphasis added), thereby implying that it was viewing LAM, also, as such a society.

In any event, and without foreclosing further examination of this issue by the CRT on the remand, we reject the belated claim by the intervenors and the CRT that LAM should be treated as an unaffiliated owner under subsection (A), and for purposes of this appeal we regard ACEMLA, Latin American Music, and Latin American Music, Inc. as the performing rights societies they alleged themselves to be. This means that the distribution proceeding must be determined under subsection (B) of § 116(c)(4).

C. *Partial Distribution of the Fund.*

■ We find no merit in LAM's challenge below to the CRT's determination that 90 percent of the fund was not in controversy. At the time the CRT ordered partial distribution, before it were the claims of LAM, which sought five percent of the fund, and of two unaffiliated individual owners, who at best might have recovered only very small portions—less than one percent each. All the rest of the fund was claimed only by the parties to the agreement. By declaring that a controversy existed as to ten percent of the fund, the CRT left a substantial margin to protect LAM and the individual claimants. The CRT's decision, therefore, was reasonable and fell within the discretion granted by congress which expressly authorized the CRT "to distribute any amounts that are not in controversy." 17 U.S.C. § 116(c)(4)(C).

As it comes to us, therefore, a controversy exists only with respect to ten percent of the 1982 fund, and we turn to the heart of that controversy, whether the CRT's final distribution of that ten percent was in accordance with law.

D. *The CRT's Error of Law.*

■ We recognize that the CRT is a unique agency created by congress in the legislative branch to perform functions unlike those delegated to any other federal agency. In granting the CRT authority to establish royalty fees for blanket licenses for all jukeboxes in the country and to distribute the net proceeds from those licenses among all possible claimants congress intended the agency to function with wide discretion and to develop, within the statutory framework, procedures that would fairly compensate copyright owners for the use of their songs on licensed jukeboxes.

By referring to them specifically in the statute, congress recognized that in 1976 three performing rights societies, ASCAP, BMI, and SESAC, held dominant positions in the music copyright field. Congress also sought to make the work of the CRT as uncomplicated and free of technical proceedings as it could, consistent with the rights of claimants. Not precise adjudication, but fairness and rough justice seem to have been the congressional objectives established by the 1976 amendment. Agreement among the performing rights societies, which together represent the vast majority of copyrights, was expressly encouraged by congress. If the societies can agree, the CRT is authorized to distribute the entire fund according to the agreement, and such agreements are granted express exemption from antitrust restrictions. 17 U.S.C. § 116(c)(2).

Despite the exceptionally broad discretion generally granted to the CRT, congress did instruct the agency to distribute the jukebox fees in a specific manner. In separate subparagraphs of 17 U.S.C. § 116(c)(4) it set up two classes of claimants. Under subsection (A) the moneys

should first go "to every copyright owner not affiliated with a performing rights society", and then under subsection (B), the remainder of the fees are to be distributed "to the performing rights societies * * * in such pro rata shares as they shall by agreement stipulate among themselves, or, *if they fail to agree, the pro rata share to which such performing rights societies prove entitlement.*" (Emphasis added).

Putting aside the two claims submitted under subsection (A) by Walsh and Belcher, because they have sought no review before us, we conclude that the controversy before the CRT was among performing rights societies and was therefore governed by subsection (B). Four of the societies, who are the intervenors, reached an agreement; they claimed to administer hundreds of thousands of copyrights. The three societies described herein as LAM, however, did not join in that agreement; they claimed to own or administer over 20,000 copyrights. Since the "societies" failed to agree, the CRT was directed under subsection (B) to distribute the fund pro rata as the societies "prove entitlement".

But this it did not do. Instead, the CRT focused first on LAM, analyzed its submission, and concluded that the submission was insufficient to prove LAM's entitlement to any part of the fund. Only then did the CRT turn to the four other societies; but instead of determining whether those four had proved entitlement under the last part of subsection (B), the CRT reverted to the first part of subsection (B), which authorized agreements, and divided the ten percent of the fees that were in controversy among those four in accordance with their agreement.

■ Such a procedure was error because it conflicts with congress's command as set forth in subsection (B). Distribution in accordance with an agreement is authorized by that subsection only when all the performing rights societies agree. Where "they", *i.e.*, "the performing rights societies", fail to agree, distribution is authorized only in the pro-rata shares to which the societies "prove entitlement". Absent total

agreement, there is nothing in the statute or in the legislative history to permit any particular society or group of agreeing societies to share in the distribution if they fail to prove entitlement.

It is true that LAM had failed to show that a single one of its recordings was actually performed on any licensed jukebox. But ASCAP, BMI, SESAC, and IBC had also failed to prove any actual performances, and their agreement was not a sufficient substitute for proof. It may be that in the absence of direct proof of actual jukebox performances the CRT might have taken "judicial" or "administrative" notice that some performances of the copyrighted works of ASCAP, BMI, and SESAC must have occurred because of the dominant position they hold in the industry. However, if the CRT wishes to do that, it must say so in its decision. While congress has given the CRT wide discretion, it did require that the agency "state in detail the criteria * *, the various facts that it found * * *, and the specific reasons for its determination." 17 U.S.C. § 803(b). Here the CRT did not even attempt to address the affirmative side of the intervenors' claims; it was content to knock out LAM's claim and then, as if there had never been a controversy, rely on the agreement reached by the remaining societies, even though their proof on this record was no better than LAM's.

■ We do not imply that proof of actual jukebox performances is a prerequisite to entitlement to a portion of the fund; the type of proof that will be acceptable and the weight it should receive lie largely in the discretion of the CRT. But when the performing rights societies fail to agree on a distribution, the same standards of proof of entitlement must be applied to all the competing societies, and in compliance with the statute, the CRT must state the criteria, facts, and specific reasons underlying its distribution order.

■ Since the decision of the CRT was not in accordance with law, the case is remanded for further proceedings before the CRT to provide all the claiming socie-

ties an opportunity to prove entitlement to the ten percent of the 1982 fund that remains in controversy, and to provide the CRT an opportunity to make its determination in accordance with law.