GEORGE LEE KINDRED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kindred v. Commissioner
Docket No. 10475-77. United States Tax Court
T.C. Memo 1979-457; 1979 Tax Ct. Memo LEXIS 71; 39 T.C.M. (CCH) 490; T.C.M. (RIA) 79457; November 19, 1979, Filed George Lee Kindred, pro se. Richard A. Witkowski, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes and additions to tax: Section
Section
Taxable
6651(a)
6654
Year
Deficiency
Addition
Addition
1967
$2,642.75
$660.69
$ 83.13
1968
950.57
237.64
29.91
1969
2,512.63
628.16
79.05
1970
1,482.22
370.56
46.25
1971
993.93
248.48
31.27
1972
697.68
174.42
21.95
1973
844.96
211.24
26.58
1974
1.024.81
256.20
32.23
1975.h970.18
242.55
41.66
Four issues are presented for decision: 1. Whether petitioner received taxable income in the amounts determined by respondent or in any amounts during 1967 through 1975. 2. Whether petitioner is liable under section 1401[1]/ for self-employment taxes for 1967 through 1975. *74 3. Whether petitioner is liable under section 6651(a) for the addition to tax for failure to file an income tax return for each of the years 1967 through 1975. 4. Whether petitioner is liable under section 6654 for the addition to tax for underpayment of estimated tax for 1967 through 1975. FINDINGS OF FACT At the time the petition was filed in this case, petitioner was a legal resident of Pinckney, Michigan. For the taxable years 1967, 1968, and 1969, petitioner filed Forms 1040 which contained no information from which a tax liability could be computed. Across the face of the Form 1040 for 1967 the following was written: PROTEST. I plead the following parts of the U.S. Constitution: The Preamble - Art. 1, sec. 1 - Art. 1, sec. 2, clause 3 - Art. 1, sec. 8, clause 1 - Art. 1, sec. 8, clause 2 - Art. 1, sec. 8, clause 5 - Art. 1, sec. 8, clause 6 - Art. 1, sec. 9, clause 2 - Art. 1, sec. 9, clause 3, 4, 7 - Art. 1, sec. 10, clause 1 - and other Articles - plus Amendments 1, 4, 5, 6, 7, 8, 9, 10, 13, & 14, sec. 1. Statements of similar import were inscribed on the Forms 1040 filed for 1968 and 1969. Petitioner filed no income tax returns for 1970, 1971, *75 1972, 1973, 1974, and 1975.
During the taxable years 1967 through 1975, petitioner was self-employed. During 1967 and 1968, petitioner was paid $14,094.85 and $2,955.44, respectively, by Rose Hill Realty, Inc. During 1968, 1969, and 1970, petitioner was paid $1,035, $12,589.05, and $9,281.70 by Howell Town & Country Realty. In 1968, petitioner received $3,000 from Jack Stastuk of Jack Stastuk Associates (Associates); this sum was advanced to petitioner on the understanding that it would be repaid from earnings with Associates. During the course of an examination with respect to petitioner's income tax liability for 1968 through 1975, petitioner failed or refused to provide the examining agent with any informaltion as to the amount or source of his income for those years. He maintained no checking, savings, or other bank accounts. He conducted all of his financial transactions by use of currency or money orders. Petitioner received no inheritances during 1967 through 1975. During 1967 through 1975, petitioner, his wife, and three children lived on a small farm near Pinckney, Michigan. In 1968, petitioner purchased this farm on a sales contract on which he paid $180 per *76 month. In addition, he paid taxes on the farm; the taxes, which were increasing, amounted to $1,000 per year at the time of the trial. He also paid heating and other utility bills. On this farm, petitioner raised food crops and chickens. Part of the food for his family was derived from these crops, from eggs laid by the chickens, and from chickens butchered for table use. Some of the produce grown on the farm was exchanged with neighbors for other food items. During this period, petitioner was actively engaged in what has been called a tax revolt movement. He spent approximately 6 months in prison in 1971 on a charge of contempt for refusal to obey a court order directing him to disclose his income records to the Michigan State income tax authorities. Following his release, he traveled to numerous places throughout the United States to attend tax revolt meetings where he made speeches on the Constitution and its relationship to the tax laws and on the growing power and extent of the government. In these speeches, he described how some individuals were filing income tax returns which contained no information with respect to their income and others were refusing to file any *77 income tax returns at all. At each of these meetings, a hat or other receptacle was placed on a table or was passed through the crowd, and contributions were given petitioner. Also, at these meetings, printed literature, at least some of which was furnished to petitioner without cost, was distributed. Individuals who took the literature made contributions. Petitioner also received contributions through the mails. The contributors of all these funds made the donations to petitioner primarily in order to enable him to carry on his tax revolt activities.Petitioner maintained no records with respect to either these donations or income of any sort which he received. During 1971 through 1975, petitioner made tax revolt speeches and received moneys at various locations throughout the United States, including cities in New York, Illinois, Missouri, and California, and in Washington, D.C., as well as in numerous cities in Michigan nearer his home, such as Lansing, Muskegon, Howell, Grand Haven, Allegan, and Detroit. In estimating the amounts of petitioner's taxable income for 1967, 1968, 1969, and 1970, respondent determined that petitioner received commission income in the amounts *78 of $14,094.85, $6,990.44, $12,589.08, and $9,281.70, respectively. For 1971 through 1975, the examining agent used information obtained from the Department of Labor, Bureau of Labor Statistics (hereinafter Labor), for certain categories of expenses incurred by a four-member family in the lower income level, nonmetropolitan area of the north-central region. From the figures published by Labor, the examining agent subtracted the amounts included for taxes to derive a base total income figure, which he adjusted to compute a figure applicable to a family of five. OPINION 1. Income Tax Liability
Petitioner disputes respondent's determination for the entire period at issue. In the petition, he alleges that he had no income during 1971 through 1975 but subsisted "off the land, and by reason of God, Yahweh, Jesus Christ's Blessing, and by virtue of savings and frugality, and via the charity of family and friends." He characterizes respondent's determination for that period, which was based on Labor's statistics, as erroneous and arbitrary; the nature of the determination, in his view, shifts the burden of proof to respondent. There is no merit to petitioner's contentions. *79 As to 1967 through 1970, the parties stipulated that petitioner received payments from Rose Hill Realty, Inc., in the amounts of $14,094.85 in 1967 and $2,955.44 in 1968. The parties further stipulated that petitioner received commissions from Howell Town & Country Realty in the amounts of $1,035 in 1968, $12,589.05 in 1969, and $9,281.70 in 1970. Except for an additional $3,000 discussed below, these are the precise amounts of income which respondent determined that petitioner received in 1968, 1969, and 1970. As to these amounts, respondent's determination must sustained. In 1968, petitioner received $3,000 from Associates. In his reply to respondent's interrogatories, which was admitted in evidence, petitioner characterized this $3,000 as an amount loaned to petitioner, a portion each week, which "was to have been paid back out of any commissions Petitioner had coming." Petitioner testified that, after he left its employ, Associates tried to collect the funds advanced to him. In the light of all the evidence, we have concluded that this $3,000 was a loan to petitioner and is not taxable to him in 1968. Cf. Beaver v. Commissioner,55 T.C. 85, 91-92 (1970). *80 As to 1971 through 1975, petitioner filed no income tax returns. On audit, he failed or refused to furnish any information to the examining agent on which an estimate of his income could be based. An investigation by the Internal Revenue Service revealed no bank accounts or other bank or business transactions which would reflect the source or amount of his taxable income. Testimony at the trial confirmed that petitioner had no bank accounts and that he paid all his bills by use of currency or money orders. The examining revenue agent was aware of petitioner's speechmaking activities which, as described in our Findings, included collections of funds and of his open and flagrant defiance of the government and its taxing authorities. Because the agent could locate no evidence which would indicated the amount of petitioner's income, he determined the deficiencies on the basis of Labor's statistics showing the amount of income required for the support of lower income families with four members in a nonmetropolitan area in the north-central region of the United States and adjusted those figures to derive the amount of income required to support a family of five. In the circumstances *81 of this case, we think the procedure followed by the examining agent was reasonable. In Giddio v. Commissioner,54 T.C. 1530 (1970), an individual who had been arrested for accepting wagers filed no income tax returns. Sustaining a determination of the amount of the taxpayer's income based on a table furnished by Labor, the Court stated in part (Supra at 1533): * * * section 6212(a) provides for the issuance of a notice of deficiency where the Secretary or his delegate "determines that there is a deficiency" in respect of certain taxes.Nowhere in the Code is there a provision which specifies the nature and quality of the evidence which the tax administrator must gather to support the determination, or the form and contents of the notice. * * * The absence of statutory guidelines suggests that Congress intended that the Internal Revenue Service should have great latitude in making determinations of liability, particularly where the taxpayer files no returns and refuses to cooperate in the ascertainment of his income. Otherwise, "skilful concealment," would be an "invincible barrier" to the determination of tax liability. United States v. Johnson,319 U.S. 503, 518 (1943); *82 see also Rouss v. Bowers,30 F.2d 628, 630 (C.A. 2, 1929), certiorari denied 279 U.S. 853 (1929). Where as in this case, there is evidence of taxable income but no information can be acquired to ascertain the amount of such income, we do not think it is arbitrary for the Commissioner to determine that the taxpayer had income at least equal to the normal cost of supporting his family. Cf., e.g., Toledano v. Commissioner,362 F.2d 243, 246 (C.A. 5, 1966), affirming in part a Memorandum Opinion of this Court. In this case, as in Giddio v. Commissioner,supra, use of Labor's statistics was a reasonable method to estimate expenses for a taxpayer supporting himself, his wife, and three children. During the period in issue, petitioner was paying not only ordinary living expenses for himself and his family but also approximately $180 per month on a contract for the purchase of his farm and home together with local taxes on that property. According to petitioner's testimony, those taxes, which approximated $1,000 per year at *83 the time of trial, were increasing.Quite clearly, petitioner was receiving and using funds from some source. The testimony of petitioner's own witnesses shows the source of the funds used to defray these expenses in each of the years 1971 through 1975. The witnesses testified that petitioner conducted numerous tax revolt meetings in cities throughoiut the United States and that money was collected at these meetings to support petitioner's tax revolt work. Furthermore, testimony established that petitioner made available at these meetings printed material given to him and suggested that contributions would help pay its cost. [2]/ Contributors mailed monay to him as well.Since petitioner did not show that he had any other income source, it is reasonable to infer that at least part of these receipts was used to support petitioner and his family. Petitioner offered no evidence, in the form of records or oral estimates, as to the amount of funds he collected; what portion of the funds he used *84 to defray his travel and related expenses; or what portion he used to cover his home mortgage, tax payments, and other living expenses. In fact, he denied that he kept any records of the amounts of these collections or his expenditures. Thus he failed to carry his burden of proving that he had less taxable income than the amounts determined by respondent. We must, therefore, sustain respondent's determination. Petitioner argues that use of Labor's statistics as a basis for estimating his taxable income was so arbitrary as to shift the burden of proof to respondent. We do not agree. Giddio v. Commissioner,supra at 1533. Such statistics reflect the average living costs of similar families in the same locality, thus providing a basis for an estimate as accurate as could be made without some disclosures from petitioner as to his living costs.And he failed or refused to make any such disclosures. When reconstructing income according to the net worth increase, bank deposits and cash expenditures, or cash disbursements methods, an estimate of nondeductible personal *85 living costs is almost invariably taken into account. See Holland v. United States,348 U.S. 121, 125 (1954), reh. denied 348 U.S. 932 (1955) (net worth method); Viles v. Commissioner,233 F.2d 376, 378-379 (6th Cir. 1956), affg. a Memorandum Opinion of this Court (cash disbursements method); Taglianetti v. United States,398 F.2d 558, 562 (1st Cir. 1968); Taglianetti v. Commissioner,69 T.C. 729, 738-742 (1978). The correctness of that estimate, as in the case of the determined net worth increases or other expenditures, becomes a factual issue on which the taxpayer has the burden of showing error. Toledano v. Commissioner,362 F.2d 243, 246 (5th Cir. 1966). In the instant case, the Commissioner determined deficiencies based solely on an estimate of the amount of petitioner's personal living expenses. We think such determination was sufficient to cast the burden of proof upon petitioner as to the correctness of that determination. Petitioner has not carried that burden. He did not show that he had an accumulation of funds which was used to pay his living expenses during the *86 period in issue. Further, it was stipulated that he received no inheritances during that period. Petitioner offered testimony that he and his family were in dire financial straits at certain times, particularly during and immediately after his 1971 stay in jail, and that his neighbors made gifts of food and cash during that period. Gifts to petitioner and his family which proceeded from a detached and disinterested generosity or "out of affection, respect, admiration, charity or like impulses" would be nontaxable. Robertson v. United States,343 U.S. 711, 714 (1952); Commissioner v. Duberstein,363 U.S. 278 (1960); Commissioner v. LoBue,351 U.S. 243, 246 (1956. But petitioner also offered the testimony of a large number of witnesses who testified that they donated funds to petitioner to enable him to carry on his tax revolt activities. [3]/ *87 Gross income as defined by section 61[4]/ encompasses all income "from whatever source derived" except as excluded by other Code provisions. Sec. 1.61-1(a), Income Tax Regs. Congress, as the Supreme Court has stated, used that language in order to exert the full measure of its taxing power. Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 429 (1955). We must, therefore, construe the statute to promote that purpose. Helvering v. Clifford,309 U.S. 331, 334 (1940). Funds collected as political or similar contributions and used by petitioner for the support of himself and his family are gross income rather than nontaxable gifts. And, as noted above, petitioner failed to show what part of the contributions he received was charity and what part was given to him to promote a tax revolt and diverted to his own use. *88 Numerous court decisions hold that a taxpayer who has received political or similar contributions, faced with a determination that he received taxable income, may have the burden of showing whether he used those contributions to cover personal expenses. Some cases involve campaign contributions given to elected public officials who failed to show that such funds were used for political purposes, and such failure was held to support an inference that the funds were used for personal purposes. O'Dwyer v. Commissioner,266 F.2d 575, 585-586 (4th Cir. 1959), affg. 28 T.C. 698 (1957), cert. denied 361 U.S. 862 (1959); United States v. Jett,352 F.2d 179, 182 (6th Cir. 1965), cert. denied 383 U.S. 935 (1966). A similar conclusion has been reached when funds controlled by a church's unsalaried minister were diverted to his personal use. Potito v. Commissioner,534 F.2d 49 (5th Cir. 1976), affg. per curiam a Memorandum Opinion of this Court, cert. denied 429 U.S. 1039 (1977). In sustaining the Commissioner's determination in Potito, the court found that the taxpayer had personal *89 living expenses in excess of the amount of disposable income he reported to the Internal Revenue Service, that he had received income in the form of cash or the use of certain property which was given in consideration for his services as a minister, and that he had not established certain claimed business deductions which would offset that income. The principle enunciated in these cases applies here. Although not an established political party, the movement led by petitioner has a political purpose, that of undermining the local, State, and Federal revenue systems. Petitioner received funds to finance his tax revolt and other activities, and at least a part of those funds were diverted to his own use. He is taxable on the amounts so diverted, and he had not shown that such amounts were less than the amounts of taxable income determined by respondent. 2. Liability for Self-Employment Tax
Section 1401 imposes a tax on "the self-employment income" of every individual. In general, self-employment income consists of "the net earnings derived by an individual (other than a nonresident *90 alien) from a trade or business carried on by him as sole proprietor," less allowable deductions and certain exclusions. Sec. 1.1401-1(c), Income Tax Regs.; sec. 1402(a). As used in section 1402, the term "trade or business" has the same meaning as when used in section 162. Sec. 1.1402(c)-1, Income Tax Regs. Under section 162, the issue as to whether a taxpayer is engaged in a trade or business is a factual one. Petitioner has not show error in respondent's determination that he is subject to the self-employment tax for 1967 through 1975. Petitioner offered no evidence of the terms of the arrangement pursuant to which he received commissions from real estate companies during 1967 through 1970.Depending upon the facts, one may work as a real estate agent in the capacity of an employee or in that of an independent contractor. Cf. Bell v. Commissioner,13 T.C. 344, 350 (1949). The real estate companies that paid money to petitioner during these years did not report the payments as the wages of an employee. Since petitioner offered no substantial, credible evidence to show the terms of his employment *91 with the real estate companies, we have no alternative but to sustain respondent's determination. As to the period 1971 through 1975, petitioner's business was attempting to promote a tax revolt. To this cause he devoted his time and his efforts. He had no other employment or business pursuit.He traveled throughout the United States making speeches protesting the income tax, arguing that it violated the Constitution. At each meeting collection of funds were made, and he received contributions by mail. As discussed above, in this manner he earned a livelihood for himself and his family. We think such continuous activity constitutes self-employment in a trade or business engaged in for profit. The self-employment tax applies. 3. Additions to Tax under Sections 6651(a) and 6654
Section 6651(a)[5]/ imposes an addition to tax for failure to file a return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Since the Forms 1040 filed by petitioner for 1967, 1968, and 1969, contained no financial information from which a tax liability could be computed, they were not "returns" within the meaning of this section. United States v. Johnson,577 F.2d 1304, 1310-1311 (5th Cir. 1978); *92 United States v. Porth,426 F.2d 519, 522-523 (10th Cir. 1970), cert. denied 400 U.S. 824 (1970). For 1970 through 1975, petitioner filed nothing in the way of an income tax return. Since petitioner has not shown reasonable cause for his failure to file returns, we must sustain the section 6651(a) addition to tax. *93 Section 6654(a)[6]/ provides for an addition to tax if estimated taxes are underpaid. Section 6015(a) provides that every individual shall make a declaration of estimated tax if gross income can reasonably be expected to exceed a stated amount ( $200 in 1967 through 1971 and $500 in 1972 through 1975) from sources other than wages. Section 6153 provides that the amount of the estimated tax is to be paid during the taxable year; failure to pay such estimated tax results in liability for the section 6654(a) addition to tax. The statute does not provide relief due to extenuating circumstances. Estate of Ruben v. Commissioner,33 T.C. 1071, 1072 (1960). Imposition of the addition to tax, therefore, must be sustained. *94 Petitioner advances a series of constitutional arguments: (1) That "income" as used in the Sixteenth Amendment was not intended to include "a wage, salary, fee, first-time commission, or compensation for any kind of labor"; (2) that Federal Reserve notes not being lawful money, his receipts in such notes do not constitute taxable income; (3) that imposition of the income tax on him restricts his free exercise of religion under the Constitution; and (4) that the Ninth Amendment to the Constitution indicates that the people have retained "the right to not be taxed except by consent." All these arguments are frivolous. Section 61 defines "gross income" as encompassing "all income from whatever source derived" including but not limited to "compensation for services, including fees, commissions, and similar items." Basically similar language in every Revenue Act since 1913 has been sustained by the courts. See Eisner v. Macomber,252 U.S. 189, 207 (1920); Commissioner v. Glenshaw Glass Co.,supra at 429-430. Federal Reserve notes are taxable income. United States v. Dlay,481 F.2d 28, 30 (8th Cir. 1973), cert. denied 414 U.S. 1064 (1973). *95 The income tax does not interfere with petitioner's First Amendment right to exercise his religion. Autenrieth v. Cullen,418 F.2d 586, 588-589 (9th Cir. 1969), cert. denied 397 U.S. 1036 (1970). Consent to imposition of the income tax is reflected in the Sixteenth Amendment and in the numerous revenue laws enacted since adoption of that amendment. [7]/ *96 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. / Petitioner testified that he could-- recall saying it would be wonderful to get some printing out, and this is what the bill is going to be--something to that effect, yes.↩
3. / For example, on being questioned by petitioner, his son testified that gifts were "brought by friends or in the mail" and that the donors said they "were supporting you because they believed in what you were doing * * * fighting to stop, what is in my opinion, any illegal confiscatory tax." Another witness testified that he had given petitioner money because: I thoroughly and completely approve of what you're trying to do--restore Constitutional Government to this country, get rid of the ravenous, tyrannical Government that we have fostered--allowed to foster. Another witness testified he attended meetings and gave petitioner money "to help the tax movement." Still another witness testified that he "contributed money to his [petitioner's] support so that he could carry out the work designed to preserve the country."↩
4. SEC. 61. CROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; (2) Gross income derived from business;↩
5. SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX. (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate;↩
6. SEC. 6654. FAILURE BY INDIVIDUAL TO PAY ESTIMATED INCOME TAX. (a) Addition to the Tax.--In the case of any underpayment of estimated tax by an individual, except as provided in subsection (d), there shall be added to the tax under chapter 1 and the tax under chapter 2 for the taxable year an amount determined at an annual rate established under section 6621 upon the amount of the underpayment (determined under subsection (b)) for the period of the underpayment (determined under subsection (c)).↩
7. / On the motion of respondent, the Court quashed a subpoena served by petitioner on Roger Plate, District Director of Internal Revene. Respondent filed with the Court an affidavit by Mr. Plate stating that he "was not involved in the audit and investigation of the income tax liability of petitioner, George Lee Kindred, and has no knowledge thereof"; that he "was not involved in the processing" of the case; and that he "has no knowledge or information relevant" to it. Petitioner was asked by the Court to summarize the testimony he expected to elicit from Mr. Plate, and he read a series of questions which he stated he wished to ask. None of the questions related to whether petitioner had taxable or self-employment income or was subject to the additions to tax here in issue. Despite petitioner's protestations, the Court's action in quashing the subpoena was consistent with a line of cases dealing with the subpoena of public officials. E.g., Wirtz v. Local 30, International U. of Operating Engineers,34 F.R.D. 13, 14 (S.D. N.Y. 1963); Capitol Vending Co. v. Baker,36 F.R.D. 45, 46 (D.C. D.C. 1964); United States v. Dawson,400 F.2d 194, 203 (2d Cir. 1968), cert. denied 393 U.S. 1023 (1969). We note that the agent who investigated petitioner's income tax liability was called as a witness and testified in detail as to his investigation and handling of petitioner's case. Despite petitioner's failure to furnish to the agent information as to his income, he complains on brief that he was denied certain conferences he requested by certified mail while his case was pending administratively. The record does not contain evidence of any such requests allegedly sent by certified mail. In any event, the regulations on conference procedures are directory, not mandatory, and conferences are not essential to a valid notice of deficiency. Luhring v. Glotzbach,304 F.2d 560, 563-565 (4th Cir. 1962); Cleveland Trust Co. v. United States,421 F.2d 475, 481-482 (6th Cir. 1970); Rosenberg v. Commissioner,450 F.2d 529, 532↩ (10th Cir. 1971), affg. a Memorandum Opinion of this Court.